2019 IL App (1st) 181031

No. 1-18-1031

Fourth Division
June 27, 2019

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| XL SPECIALTY INSURANCE COMPANY, | ) | Appeal from the Circuit Court of Cook County. |
|  | ) |  |
| Plaintiff and Counterdefendant-Appellant, | ) |  |
|  | ) | No. 12 CH 28651 |
| v. | ) |  |
|  | ) | The Honorable |
| PERFORMANCE AIRCRAFT LEASING, INC., | ) | Franklin U. Valderrama, |
|  | ) | Judge Presiding. |
| Defendant and Counterplaintiff-Appellee. | ) |  |
|  | ) |  |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1 The instant appeal arises from an insurance claim filed by defendant, Performance Aircraft Leasing, Inc., for property damage after one of its airplanes crashed. The insurer, plaintiff XL Specialty Insurance Company, denied the claim, claiming that defendant had breached the insurance policy because the copilot of the airplane did not possess sufficient training. Plaintiff also filed suit, seeking a declaratory judgment that it did not owe defendant coverage under the policy. The trial court granted summary judgment in favor of defendant and plaintiff appeals. For the reasons that follow, we reverse.

¶ 2                                    BACKGROUND

¶ 3                                    I. Complaint

¶ 4        On July 26, 2012, plaintiff filed a complaint for declaratory judgment, seeking a declaration that defendant was not entitled to coverage under an insurance policy for a physical damage claim arising from a plane crash that occurred on June 7, 2012. The complaint alleged that defendant owned a LearJet 60 airplane that crashed on June 7, 2012, at the Aspen-Pekin[1] County Airport in Aspen, Colorado, while it was being piloted by Paul Nemetz and Todd Chilton; the complaint alleged that Nemetz was acting as the pilot in command or, in the alternative, as the second in command, at the time of the crash. According to the complaint, upon the airplane's attempted landing at the airport, the left wingtip of the airplane struck the runway, causing the airplane to leave the runway and stop approximately 150 feet from the runway's center line. Defendant submitted an insurance claim for the damage to the airplane in the amount of $5 million, claiming that the airplane was a total loss.

¶ 5        The complaint alleged that plaintiff had issued defendant a specialty insurance policy, effective from February 14, 2012, to February 14, 2013, that provided physical damage coverage for the airplane in the amount of $5 million. The complaint alleged that the policy contained a condition precedent to coverage providing that, while in flight, the airplane would only be piloted by pilots meeting the requirements contained in an attached endorsement to the policy. The complaint further alleged that Nemetz did not satisfy the requirements contained in the endorsement at the time of the June 7, 2012, flight because he had not completed "company-approved ground and flight training" within the preceding 12

_____

[1] While the complaint refers to "Aspen-Pekin County Airport," the actual name of the airport is "Aspen-Pitkin County Airport."

months. Consequently, the complaint alleged that the policy did not provide coverage for any physical damage to the airplane arising out of that incident.[2]

¶ 6       Attached to the complaint was a copy of the insurance policy, which provided that "[w]hen in-flight the aircraft will be piloted only by pilots meeting the requirements endorsed in this Policy." The endorsement at issue was entitled the "Pilot Warranty Endorsement," and provides, in relevant part:

"It is a condition of this insurance that when in-flight, the aircraft will be operated only by the pilot(s) specified below:

* * *

Learjet 60:

PIC—Todd Chilton, Dan Greydanus, Ed Wachs or any pilot approved by the Chief Pilot of the Named Insured or their designee, provided they each have successfully completed company approved ground and flight training school for the make and model aircraft within the preceding 12 months of any date he acts as Pilot in Command.

SIC—Robert Policano, Paul Nemetz provided they each have successfully completed company approved ground and flight training for a turbine aircraft within the preceding 12 months of any date he acts as Second in Command. OR Any Pilot approved by the Chief Pilot of the named insured. With the understanding that: all turbine pilots are going to simulator school for the make and model they are operating annually or with respect to a transition pilot minimums of 3,000 hours Total Time

---

[2] The record reflects that, on August 3, 2012, plaintiff paid PNC Equipment Finance, LLC, defendant's lienholder, $2,509,015.19 to satisfy the lienholder's lien on the airplane, pursuant to an endorsement of the insurance policy that is not at issue on appeal. Plaintiff later amended its complaint on March 12, 2013, to add a breach of contract count and seek reimbursement of this payment.

with 1,500 hours in Turbine aircraft, and up to 6 months before sending them to school during that time they would be acting as Second in Command." (Emphases omitted.)

¶ 7 Also attached to the complaint was a sworn statement of proof of loss, dated July 23, 2012, which provided that defendant was making a claim for $5 million based on the total loss of the airplane as a result of the June 7, 2012, incident.

¶ 8                                                 II. Answer and Counterclaim

¶ 9 On September 19, 2012, defendant filed an answer and affirmative defenses, in which defendant admitted the material allegations concerning the occurrence of the June 7, 2012, incident; defendant denied the allegation that Nemetz was acting as pilot in command but admitted that Nemetz was piloting the airplane during the flight, including immediately prior to the incident. Defendant denied the remaining allegations of the complaint.

¶ 10 Defendant also asserted a counterclaim alleging that it was entitled to coverage for the incident and that plaintiff wrongfully denied defendant's insurance claim. Defendant alleged that Nemetz had satisfied the pilot warranty requirement and had most recently completed defendant's approved ground and flight training on March 15, 2012; defendant alleged that defendant's approved ground and flight training "consists of reviewing the training manuals for the LearJet 60 utilized by Flight Safety International, completing Universal school, and receiving flight training/ground training from chief pilot Todd Chilton." Defendant also asserted counts for breach of contract and for bad faith pursuant to section 155 of the Insurance Code (215 ILCS 5/155 (West 2010)).

¶ 11 Defendant also named as respondents in discovery LL Johns & Associates, Inc. (LL Johns), and Sean Kallsen, both of whom defendant later converted to third-party defendants.

Defendant alleged that LL Johns and Kallsen, the vice president of LL Johns, were insurance producers and insurance brokers under Illinois law, and that defendant had retained LL Johns to procure aviation insurance for defendant. Defendant alleged that, if the trial court found that defendant was not entitled to coverage under plaintiff's insurance policy, then LL Johns and Kallsen breached their duties to defendant in their actions concerning the policy.

¶ 12     Attached to the counterclaim was a letter sent by plaintiff to defendant, which was dated June 22, 2012, and denied coverage for the property damage to the airplane arising from the incident. According to the letter, Nemetz last completed a plaintiff-approved training program in May 2010, over two years before the date of the incident.

¶ 13     Attached to the third-party complaint was a copy of the 2011-2012 insurance policy (the policy for the immediately preceding policy period), as well as an amendment to that policy. In the 2011-2012 policy, pilot qualifications were included within the policy itself and provided, with respect to the airplane at issue:

> "Pilot in Command Todd Chilton, Dan Greydanus, and Ed Wachs provided they each have successfully completed company approved ground and flight training school for the make and model aircraft within the preceding 12 months of any date he acts as pilot in command.
>
> Second in Command—Robert Policano, Paul Nemetz and any pilot must successfully complete Lear 60 simulator school by May 1, 2011 or he will be removed as the pilot. He must also be accompanied by Todd Chilton as Pilot in Command.
>
> Any Pilot approved by the Chief Pilot of the Named Insured. With the understanding that: a) all turbine pilots are going to simulator school for the Make

and Model they are operating annually; b) with respect to a transition pilot minimums of 3,000 total with 1,500 Turbine, and up to 6 months before sending them to school, during that time they would be acting as Second in Command."

¶ 14    The pilot warranty endorsement to the 2011-2012 policy provided the following amendment as to the second in command:

"Robert Policano or Paul Nemetz provided they each have successfully completed company approved ground and flight training school: for a turbine aircraft within the preceding 12 months of any date he acts as Second in Command." (Emphases omitted.)

¶ 15                        III. First Cross-Motions for Summary Judgment

¶ 16                              A. Motions

¶ 17    On June 29, 2015, plaintiff filed a motion for summary judgment, claiming that there was no genuine issue of material fact that the insurance policy's pilot warranty endorsement was a condition precedent to coverage that required certain plaintiff-approved training and that no such training was approved by plaintiff. Plaintiff further argued that it was entitled to reimbursement for its satisfaction of the lien on the airplane and that it had not acted in bad faith, as alleged in defendant's counterclaim.

¶ 18    On June 30, 2015, defendant filed a cross-motion for summary judgment, claiming that the undisputed material facts established that defendant complied with the policy, that defendant was entitled to coverage for its claim, and that plaintiff's denial of the claim was unreasonable and vexatious. Accordingly, defendant claimed that it was entitled to summary judgment on both plaintiff's complaint and on its counterclaims.

¶ 19    In its motion, defendant claimed that if the court found that Nemetz had not satisfied the pilot warranty provision of the policy because he had not completed approved training, summary judgment was nonetheless warranted because Nemetz satisfied the second clause of the warranty because he had been approved by as a pilot by defendant's chief pilot, Chilton. Defendant claimed that the pilot warranty provision used the word "or" in discussing the requirements for piloting the airplane as second-in-command and argued that, even if Nemetz did not satisfy the first part of the provision, he satisfied the second.

¶ 20                                              B. Exhibits

¶ 21    Both parties primarily relied on the same exhibits in support of their respective motions for summary judgment, including a number of deposition transcripts. As the trial court did not rely on any of the expert testimony provided by the parties and the parties do not ask us to do so on appeal, we discuss only the testimony of the parties' employees and agents and discuss only the portions of the testimony relevant to the issues on appeal.

¶ 22    In his discovery deposition, Brian Ackland testified that he was a central regional manager employed with plaintiff, responsible for underwriter management, and underwrote the insurance policy at issue. While defendant was insured by plaintiff, Ackland directed his communications concerning that insurance to Kallsen at LL Johns or his assistant; Ackland testified that he would "[v]ery rarely" communicate directly with an insured as opposed to communicating through an insurance broker. Ackland testified that he met face-to-face with defendant's employees once, in January 2012, when he participated in a meeting concerning renewal of the policy with Kallsen from LL Johns, as well as Roger Soeldner, Todd Chilton, and Eddie Wachs from defendant. Ackland recalled that, at this meeting, they discussed the pilots named in the policy, including Nemetz, and their training; Ackland testified that "there

was a clear discussion about all the pilots, including those named pilots having completed formal school, formal training in the last 12 months." Ackland testified that the language contained in the pilot warranty endorsement was provided by LL Johns, and that the term "school" was removed between the 2011-2012 policy and the 2012-2013 policy.

¶ 23    In his discovery deposition,[3] Sean Kallsen testified that he was vice president at LL Johns and was the insurance agent responsible for defendant's policy; Kallsen testified that all of LL Johns' business involved aviation insurance. Kallsen testified that LL Johns would provide an insurance proposal based on the insured's requests, as well as confirmation of coverage, but would not have responsibility for ensuring that defendant's pilots satisfied the training requirements set forth in the policy. Kallsen testified that LL Johns had contractual relationships with aviation insurance companies and owed them fiduciary duties under those contracts; with respect to defendant, Kallsen testified that LL Johns served as the "conduit for them to the insurance marketplace for their aircraft exposure."

¶ 24    In his discovery deposition, Thomas Vargo testified that he was a claims representative for plaintiff, handling only aviation claims. He became involved with the instant claim only after the June 7, 2012, incident, and had no part in drafting the insurance policy. Vargo testified that his responsibility was to conduct a factual investigation and discover information about a claim, and that he did not make the determination as to whether coverage existed; after the investigation, the facts would be relayed to counsel, who would make a determination as to coverage. Vargo testified that, upon his initial review of the facts, "it was apparent that there was going to be a coverage concern as to whether Mr. Nemetz met the

---

[3] Kallsen's deposition was taken while LL Johns was a respondent in discovery and prior to defendant filing a third-party complaint against LL Johns.

pilot warranty." He notified his supervisor of the possible coverage question and received authorization to retain outside counsel and forward the information to them.

¶ 25    In his discovery deposition, Timothy Geil testified that he was regional claims manager for Charles Taylor Adjusting (Charles Taylor), a firm that was retained by plaintiff in connection with the airplane incident. Charles Taylor's responsibility was to investigate and gather facts concerning the incident, as well as handling the claim onsite, including coordinating the cleanup of the site. Geil testified that Charles Taylor did not determine coverage under the policy.

¶ 26    With respect to training, Geil testified that he requested Nemetz's pilot documentation and recurrent training certificates. Geil testified that he first heard of the policy's training provisions from Vargo and followed up by looking at the policy. Geil testified that usually, when he discussed training with Vargo, "it is typically just to advise me that the recurrent training requirement is a one-year rather than a two-year requirement." Geil explained that by "recurrent training," he was referring to "[g]round and pilot refresher training." Geil testified that there were usually a handful of providers that were authorized to provide that kind of service, but that the training could be provided in-house if approved by the insurance company. Geil was unaware if plaintiff's policy provided a list of approved providers or an approved agenda for training.

¶ 27    In his discovery deposition, Todd Chilton testified that he was chief pilot for the companies owned by Edward Wachs, which included defendant; in addition to flying airplanes, his responsibilities included managing the aircraft, scheduling and tracking maintenance, and training. Chilton testified that he was certified through the Federal Aviation Administration (FAA) as an airline transport pilot (ATP); he was not a certified flight

9

instructor. However, Chilton testified that he provided Nemetz with both ground and flight training.

¶ 28    Chilton testified that he began training Nemetz in 2009. He was able to recall one flight in 2009 that was taken for the sole purpose of training, but testified that "[e]very flight in an airplane is a training flight." Chilton also recalled three occasions between 2009 and 2012 in which he provided Nemetz with ground training outside the parameters of an operational flight; he testified that these occasions lasted a few hours and occurred early in Nemetz's training, closer to 2009. During the training, they reviewed "[p]rimarily the flight safety international manual for the aircraft," and also reviewed the airplane's flight manual. Chilton testified that he did not keep a record of any training he provided Nemetz in a logbook or in any other form, nor was he asked to endorse any such logbook maintained by Nemetz.

¶ 29    Chilton testified that he was present at a meeting in January 2012 concerning renewal of the insurance policy and that one of the requests made on defendant's behalf was the removal of the requirement that the second-in-command pilot attend "a formal school," which was incorporated into the renewed policy.

¶ 30    In his discovery deposition, Paul Nemetz testified that, at the time of the incident, he was certified as an ATP and had been a pilot since 1967, when he was in the military. From 2010 through the time of the incident, he worked as an independent contract pilot, including piloting airplanes as second-in-command for defendant. Nemetz testified that his last flight review was conducted in May 2010, and that the FAA did not require him to complete any additional flight reviews, as he was flying as second-in-command as opposed to a pilot-in-command; the review included both ground and flight training using a simulator. When asked whether he had completed any flight reviews after May 2010, Nemetz testified that "[i]n my

mind the instruction that I was receiving [and] observation in flying and working with Mr. Chilton, I considered that review."

¶ 31     Nemetz testified that, prior to his employment with defendant, Chilton informed Nemetz that he would be providing Nemetz with ground training and flight training on behalf of defendant; Chilton told Nemetz "how he was generally going to review systems with me, monitor my performance, how we would go about studying together, reviewing material. And as we went along, he would just keep me posted on what he was looking for in terms of my performance and being able to progress to the time where he felt comfortable with me being in the left seat." Nemetz did not recall any conversations about anyone sending him to flight school; he testified that his previous employers had required him to attend school annually.

¶ 32     Nemetz testified that Chilton expected Nemetz to study flight training materials at home, with Chilton periodically quizzing Nemetz about the materials; Chilton "expected me, you know, at my own speed to be reviewing these systems and getting familiar because he was going to be asking questions of me in more detail. *** This was self-paced." Nemetz was unaware of the method by which Chilton evaluated him and did not know whether Chilton created any documentation indicating that he had successfully passed an evaluation.

¶ 33     Nemetz testified that, in March 2012, he attended a two-day training in Tucson on the flight management system that was installed on the LearJet 60 airplane; he testified that the flight management system was not unique to the LearJet 60, but the training would apply to any airplane that used that type of system.

¶ 34     In his discovery deposition, Edward Wachs testified that he was the sole owner of defendant. Wachs testified that Chilton was responsible for all training for defendant and that

Wachs had reviewed "all the training regimen" with Chilton. Wachs testified that he was present at the January 2012 meeting discussing the renewal of the policy, and recalled discussing qualifications of its pilots. Wachs testified that defendant requested the removal of the word "school" from the policy with respect to the second-in-command "so that we would be able to provide training to qualified pilots in our company." Wachs could not recall if anyone discussed that Chilton would be providing the training on behalf of defendant. Wachs testified that training at a flight safety school was expensive, and that he would rather not incur the expense unless the pilot was full-time or was expected to be moved to a captain position. Wachs further testified that the more relevant training was the training performed by defendant, which was specific to defendant's flight programs.

¶ 35    In an affidavit, Chilton averred that, as defendant's chief pilot, he provided in-house training to Nemetz. Chilton averred:

> "[Defendant] provided on-going training for Paul Nemetz as each flight provided a training environment and experience. However, for purposes of the June 7, 2012 flight, Paul Nemetz's ground and flight training was completed as of March 15, 2012. [Defendant's] approved ground and flight training for Nemetz consisted of reviewing the training manuals for the LearJet 60 utilized by Flight Safety International, completing Universal school, and receiving flight training and ground training from me."

¶ 36                                C. Responses

¶ 37    In response to plaintiff's motion for summary judgment, defendant claimed that the policy could not be permitted to require plaintiff to approve Nemetz's training because the policy was silent as to any specific training requirement. Defendant further claimed that

12

plaintiff never approved any training that Nemetz could have completed, rendering the warranty illusory. Defendant also again raised the argument that Nemetz met the terms of the pilot warranty under the alternative avenue of being approved by Chilton, defendant's chief pilot. Defendant argued that Nemetz did not need to satisfy the "simulator school" portion of that avenue because the language of that portion of the provision had no recognized meaning in the aviation insurance industry.

¶ 38    In response to defendant's cross-motion for summary judgment, plaintiff argued that Nemetz did not satisfy the second "avenue" for coverage because there was no dispute that Nemetz did not attend school. Plaintiff further argued that the pilot warranty was a condition precedent to coverage, not an exclusion, meaning that defendant bore the burden of establishing that the condition had been satisfied.

¶ 39                                    D. Trial Court Ruling

¶ 40    On January 21, 2016, the trial court issued a memorandum opinion and order in which it granted plaintiff's motion for summary judgment in part and denied defendant's cross-motion for summary judgment. As an initial matter, the trial court found that the pilot warranty was a condition precedent to coverage, meaning that plaintiff was not required to establish a causal connection between the cause of the loss and the condition precedent. The court next found that, although "[t]he Pilot Warranty is not a paradigm of clarity," it was unambiguous that "company approved ground and flight training" referred to plaintiff-approved training, not defendant-approved training. However, the court found that plaintiff had failed to establish that Nemetz did not complete plaintiff-approved ground and flight training; the court found that Ackland's testimony, on which plaintiff relied, did not support that point. Instead, the court found that Ackland merely testified that he had not waived

compliance with training, and testified that he could not recall whether he approved the training of Wachs or Chilton; he never testified that Nemetz did not complete plaintiff-approved training.

¶ 41     The trial court next considered defendant's argument that Nemetz could alternatively have been qualified under the policy under the second prong of the pilot warranty. The court found that such an avenue was permissible because the qualifications for operation of the airplane as second-in-command were set forth in the disjunctive. The court first found that Nemetz had been approved by Chilton, defendant's chief pilot. However, the court found that "this alone does not entitle [defendant] to judgment," because the provision provided that the chief pilot's approval was made with the understanding that pilots were attending simulator school. The court found that defendant had failed to offer any evidence showing compliance with this final clause. The court rejected defendant's argument that the clause was a " 'mere understanding,' " not a requirement, agreeing with plaintiff that such an interpretation would render the clause meaningless. Accordingly, the trial court denied both parties' motions for summary judgment on the declaratory judgment counts because it found that both parties had failed to satisfy their respective burdens to show that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law.

¶ 42     Similarly, the trial court denied each party's motion for summary judgment based on breach of contract, finding that their claims were predicated on prevailing on their coverage positions. However, the trial court did find that plaintiff was entitled to summary judgment on defendant's counterclaim alleging bad faith under section 155 of the Insurance Code.

¶ 43                              E. Motion to Reconsider

¶ 44        On March 28, 2016, defendant filed a motion to reconsider the grant of summary judgment as to the bad-faith count of its counterclaim, as well as seeking clarification of the trial court's order as to whether the court's discussion of the facts and law constituted the law of the case for purposes of trial.

¶ 45        On September 1, 2016, the trial court denied defendant's motion to reconsider. The court made clear that, in its ruling on summary judgment, it had made the following findings: (1) that the pilot warranty provision was a condition precedent to coverage; (2) that "company approved ground and flight training" meant *plaintiff*-approved ground and flight training; (3) that the second clause of the pilot warranty provision allowed any pilot, including Nemetz, to operate the airplane as second-in-command if he was approved by defendant's chief pilot and complied with simulator school requirements; and (4) that defendant's chief pilot had approved Nemetz to operate the airplane as second-in-command. The court further made clear that, in denying summary judgment, it had found that neither party had submitted any evidence as to whether Nemetz completed plaintiff-approved ground and flight training and that defendant had failed to submit any evidence that Nemetz complied with the simulator school requirements.

¶ 46                         IV. Second Motions for Summary Judgment

¶ 47        On October 21, 2016, plaintiff filed a second motion for summary judgment, claiming that the trial court's prior orders left open only two issues—whether Nemetz had completed plaintiff-approved ground and flight training and whether Nemetz had attended simulator school—and that plaintiff had satisfied its burden of proof on each issue such that summary judgment in its favor was warranted. With respect to the first issue, plaintiff claimed that

defendant had not submitted any ground and flight training for Nemetz for plaintiff's approval between January 2012 and June 7, 2012, meaning that plaintiff had not approved any such training and Nemetz therefore did not complete plaintiff-approved ground and flight training as required by the policy. With respect to the second issue, plaintiff claimed that if defendant had any evidence that Nemetz had attended simulator school, "such information surely would have been produced by now," and consequently, defendant could not meet its burden to establish that Nemetz had attended simulator school as required by the policy.

¶ 48   Attached to the motion for summary judgment were exhibits that had been presented in the earlier briefing, as well as several additional exhibits. One such exhibit was the affidavit of Ackland, plaintiff's underwriter with respect to defendant's policy, who averred that (1) between January 2012 and June 7, 2012, defendant did not submit any ground and flight training for Nemetz to plaintiff; (2) defendant did not request approval for any such training; (3) plaintiff did not approve any such training; and (4) neither defendant nor Nemetz submitted any information or documentation pertaining to Nemetz's attendance at simulator school. Ackland further averred that plaintiff did not waive either the approval or school requirements for Nemetz.

¶ 49   On March 13, 2017, defendant filed a response to plaintiff's motion for summary judgment and a second cross-motion for summary judgment. Defendant claimed that, since the policy did not set forth the requirements for approval of defendant's pilots, the policy gave plaintiff the unilateral ability to decide pilot qualifications anytime during the policy period. Defendant argued that this gave plaintiff the power to determine whether coverage would exist, either by failing to give approval or by withdrawing approval, which rendered the pilot warranty provision illusory. Additionally, with respect to the second part of the

16

provision, defendant claimed that the policy required pilots to attend simulator school annually—not prior to the date of the accident. Thus, defendant claimed that Nemetz had satisfied the second part of the pilot warranty clause.

¶ 50    On July 25, 2017, the trial court granted defendant's motion for summary judgment and denied plaintiff's motion for summary judgment. The court first considered defendant's arguments concerning the second part of the pilot warranty and agreed with defendant's position that there was no requirement that Nemetz complete simulator school prior to the time a claim is made. The court found:

"Under the plain language of the policy under the pilot warranty's any pilot clause, it allows for an insured to complete the required simulator school training even after an accident has occurred and a claim has been filed so long as the requirement was fulfilled before the end of the policy period.

As the court previously noted, the parties to an insurance contract may incorporate in that contract any provisions not in violation of the law as they so choose. Courts are not warranted under the cloak of construction of a contract in making a new contract for the parties.

Respectfully, the court finds that that is essentially what [plaintiff] is asking this court to do by interpreting the contract at issue to require this temporal requirement. [Plaintiff] asserts that even if the foregoing interpretation is correct, Nemetz did not attend simulator school and thus failed to fulfill the requirement condition precedent to coverage.

While the court understands this argument, the court finds this argument unpersuasive. The policy's effective period was from February 14, 2012 to February

17

14, 2013. The accident occurred on or about June 7th of 2012. And [plaintiff] denied [defendant's] claim on or about June 22nd of 2012.

[Plaintiff] having denied [defendant's] claim within this timeframe, from this court's perspective, [defendant] did not have the opportunity to fulfill the simulator school requirement prior to the termination or the conclusion of the policy period; nevertheless, \*\*\* the any pilot clause does not provide that the requirement of attendance to simulator school needed to occur prior to an accident.

The court finds that [defendant] satisfied the second portion of the pilot warranty and it's undisputed that Nemetz had been approved by the chief pilot. And there was no requirement that he attend simulator school before June 7th of 2012. Therefore, the court finds that [defendant] has satisfied its burden to show that there are no genuine issues of material fact, and that it and not [plaintiff] is entitled to judgment as a matter of law."

¶ 51      On August 22, 2017, plaintiff filed a motion to reconsider, arguing that in granting summary judgment, the trial court (1) failed to give effect to the pilot warranty as a condition precedent, (2) failed to properly interpret the term "annually" properly, and (3) violated public policy because it defeated the training requirements and endangered public welfare.

¶ 52      On November 20, 2017, defendant filed a motion for final judgment, requesting that the trial court enter a final order of judgment that included a judgment for damages. In its motion, defendant noted that in plaintiff's pending motion to reconsider, it requested the inclusion of Rule 304(a) language for purposes of appealing the grant of summary judgment (Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)), and stated that "[defendant] submits to the Court that the appropriate approach would be for the Court to enter final judgment in its favor such

that all issues are resolved between [plaintiff] and [defendant] and, then, if [plaintiff] so wishes, it can file an appeal."

¶ 53    On January 12, 2018, the trial court entered an order denying plaintiff's motion to reconsider. The court clarified its prior order concerning whether the pilot warranty was a condition precedent:

> "The Second Clause contains two elements: the first is that any pilot be approved by the named insured's chief pilot, and the second is that all turbine pilots 'are going to simulator school…..annually'. It is only the first element of the Second Clause that is a condition precedent. The second element, which commences a new sentence, is not a condition precedent that must be satisfied prior to the inception of insurance coverage."

The trial court also noted that plaintiff raised several arguments for the first time in the motion to reconsider, including its public policy argument and an argument that "annually" should be interpreted to mean " 'within the preceding twelve months,' " but addressed those arguments notwithstanding plaintiff's forfeiture of them and found them unpersuasive.

¶ 54    On April 23, 2018, the trial court granted defendant's motion for final judgment, entering judgment (1) in the amount of $2,490,984.81 for physical damage to the airplane; (2) for property damage and supplemental payment claim damages; (3) for an award of prejudgment interest; and (4) for costs. The total judgment entered by the trial court was $3,218,145.94 in favor of defendant and against plaintiff. The court further found that the order was final and appealable pursuant to Rule 304(a), and stayed further proceedings pending appeal.

¶ 55    On May 21, 2018, plaintiff filed a notice of appeal, which provided that plaintiff was appealing "from the judgment of the Circuit Court of Cook County entered on April 23,

19

2018, and the orders leading to the entry of that judgment." The notice of appeal further provided:

"In the Appellate Court of Illinois, [plaintiff] shall pray that the aforesaid judgment be reversed and the orders leading to the entry of that judgment vacated, and that judgment be entered in the Appellate Court of Illinois for [plaintiff]. In the alternative, [plaintiff] shall pray that the aforesaid judgment be reversed and the orders leading to the entry of that judgment vacated, and that the cause be remanded to the Circuit Court for the entry of judgment for [plaintiff]. In the further alternative, [plaintiff] shall pray that the aforesaid judgment be reversed and the orders leading to the entry of that judgment vacated, and that the cause be remanded to the Circuit Court for further proceedings. In the further alternative, [plaintiff] shall pray that the aforesaid judgment be reversed and the orders leading to the entry of that judgment vacated, and that it be granted such other and further relief as the Court deems fit and proper under the circumstances."

¶ 56                                    ANALYSIS

¶ 57      On appeal, plaintiff claims that the trial court erred in finding that defendant had complied with the pilot warranty endorsement. As an initial matter, defendant claims we lack jurisdiction over the instant appeal because plaintiff's notice of appeal names only the April 23, 2018, order entering final judgment and does not specifically list either of summary judgment orders. The filing of a notice of appeal " 'is the jurisdictional step which initiates appellate review.' " *People v. Smith*, 228 Ill. 2d 95, 104 (2008) (quoting *Niccum v. Botti, Marinaccio, DeSalvo & Tameling, Ltd.*, 182 Ill. 2d 6, 7 (1998), citing 155 Ill. 2d R. 301).

20

"Unless there is a properly filed notice of appeal, a reviewing court has no jurisdiction over the appeal and is obliged to dismiss it." *Smith*, 228 Ill. 2d at 104.

¶ 58        Under Illinois Supreme Court Rule 303(b)(2) (eff. July 1, 2017), a notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." "A notice of appeal confers jurisdiction on a court of review to consider the judgments or parts of judgments specified in the notice of appeal." *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 176 (2011). Our supreme court has made clear, however, that a notice of appeal is to be construed liberally. *Smith*, 228 Ill. 2d at 104. "The notice of appeal should be considered as a whole and will be deemed sufficient to confer jurisdiction on an appellate court when it fairly and adequately sets out the judgment complained of and the relief sought, thus advising the successful litigant of the nature of the appeal." *General Motors*, 242 Ill. 2d at 176. " 'Where the deficiency in notice is one of form, rather than substance, and the appellee is not prejudiced, the failure to comply strictly with the form of notice is not fatal.' " *Smith*, 228 Ill. 2d at 105 (quoting *Lang v. Consumers Insurance Service, Inc.*, 222 Ill. App. 3d 226, 230 (1991)). Thus, our supreme court has long held that a judgment that is not specified in the notice of appeal is nonetheless reviewable "if it is a 'step in the procedural progression leading' to the judgment specified in the notice of appeal." *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 435 (1979) (quoting *Elfman Motors, Inc. v. Chrysler Corp.*, 567 F.2d 1252, 1254 (3d Cir. 1977)); see *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 23 (finding a denial of petition for substitution of judge was a "step in the procedural progression leading to the final judgment" specified in the notice of appeal).

¶ 59        In the case at bar, there is no doubt that the summary judgment orders were steps in the procedural progression leading to the entry of the order listed in the notice of appeal. That

order was an order granting final judgment and determining the amount of damages to which defendant was entitled, which arises directly from the trial court's grant of summary judgment in its favor. We are therefore unpersuaded by defendant's attempts to style the summary judgment orders as somehow entirely distinct from the final order granting defendant relief based on those earlier orders.

¶ 60 We further note that plaintiff's notice of appeal specified that it was appealing the April 23, 2018, order "*and the orders leading to the entry of that judgment*" (emphasis added), and that the relief sought by plaintiff included the entry of judgment in its favor. Thus, plaintiff made clear that it was appealing orders other than the April 23, 2018, order. Defendant analogizes the language used by plaintiff to that used in *Neiman v. Economy Preferred Insurance Co.*, 357 Ill. App. 3d 786 (2005), a case in which the notice of appeal was found insufficient to confer appellate jurisdiction over certain orders. However, that case involved orders denying a motion to substitute judge and a motion to disqualify a law firm, which the *Neiman* court found were "merely ancillary orders of a procedural nature which have no impact upon the latter substantive orders."[4] *Neiman*, 357 Ill. App. 3d at 791. It is unpersuasive to say that, in the case at bar, the summary judgment orders were similarly "merely ancillary orders." Accordingly, the *Neiman* court's holding is completely inapplicable to the instant case. We also note that defendant places a great deal of weight on the wording of the "and the orders leading to the entry of that judgment" language, attempting to compare it to the language used in *Neiman* and *Burtell*. While the language is relevant in analyzing whether certain orders are encompassed by the notice of appeal, the

---

[4] We also note that the *Neiman* court's holding as to the motion to substitute judge conflicted with the Second District's position, and that our supreme court has agreed with the Second District that a motion to substitute judge is a step in the procedural progression leading to the entry of final judgment. See *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 23.

more important inquiry—conducted by both the *Neiman* and *Burtell* courts—is whether the order itself is considered a step in the procedural progression leading to the order listed in the notice of appeal. Here, the summary judgment orders clearly were, and we therefore have jurisdiction to consider them.

¶ 61 Finally, we find unpersuasive defendant's claim that it was somehow surprised that plaintiff was appealing the summary judgment orders. Defendant suggests that the trial court's denial of plaintiff's motion to reconsider was "[s]uch a resounding judicial repudiation of [plaintiff's] arguments, combined with a strongly-worded reaffirmation of the court's grant of summary judgment," that defendant concluded "that an appeal was very unlikely." However, defendant was fully aware of plaintiff's intent to appeal—in its motion for a final judgment, defendant acknowledges that in the motion to reconsider, plaintiff sought Rule 304(a) language so that it could appeal, and even suggested that the appropriate approach would be for entry of a final judgment first, which would render Rule 304(a) language unnecessary. It is questionable that defendant would suggest that, after the parties battled through two rounds of summary judgment, followed by plaintiff losing on a motion to reconsider, that defendant believed plaintiff would not appeal. Consequently, we find we have jurisdiction over the instant appeal, and proceed to consider the merits of plaintiff's arguments.

¶ 62 As noted, plaintiff claims that the trial court erred in granting defendant's motion for summary judgment and finding that the pilot warranty endorsement was satisfied. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

23

735 ILCS 5/2-1005(c) (West 2016). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). " 'The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment.' " *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755 (2005) (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993)).

¶ 63    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis

appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 64        On appeal, plaintiff claims that Nemetz failed to satisfy either prong of the pilot warranty and, therefore, defendant was not entitled to coverage for its loss. As the trial court's grant of summary judgment was based on the second prong of the warranty, we consider those arguments first.

¶ 65        As noted, the insurance policy provided that "[w]hen in-flight the aircraft will be piloted only by pilots meeting the requirements endorsed in this Policy." The pilot warranty endorsement at issue provided, in relevant part:

> "It is a condition of this insurance that when in-flight, the aircraft will be operated only by the pilot(s) specified below:
>
> * * *
>
> Learjet 60:
>
> PIC—Todd Chilton, Dan Greydanus, Ed Wachs or any pilot approved by the Chief Pilot of the Named Insured or their designee, provided they each have successfully completed company approved ground and flight training school for the make and model aircraft within the preceding 12 months of any date he acts as Pilot in Command.
>
> SIC—Robert Policano, Paul Nemetz provided they each have successfully completed company approved ground and flight training for a turbine aircraft within the preceding 12 months of any date he acts as Second in Command. OR Any Pilot approved by the Chief Pilot of the named insured. With the understanding that: all turbine pilots are going to simulator school for the make and model they are operating

annually or with respect to a transition pilot minimums of 3,000 hours Total Time with 1,500 hours in Turbine aircraft, and up to 6 months before sending them to school during that time they would be acting as Second in Command." (Emphases omitted.)

¶ 66 The parties agree that the provision concerning the second-in-command has two parts. First is what the parties term the "named pilot" clause, which specifies:

"Robert Policano, Paul Nemetz provided they each have successfully completed company approved ground and flight training for a turbine aircraft within the preceding 12 months of any date he acts as Second in Command."

The second is the "open pilot" or "any pilot" clause, which specifies:

"Any Pilot approved by the Chief Pilot of the named insured. With the understanding that: all turbine pilots are going to simulator school for the make and model they are operating annually or with respect to a transition pilot minimums of 3,000 hours Total Time with 1,500 hours in Turbine aircraft, and up to 6 months before sending them to school during that time they would be acting as Second in Command."

¶ 67 The trial court found that these two clauses provided two separate avenues for a pilot to be qualified as a second-in-command and that Nemetz satisfied the warranty under the second clause. Plaintiff's first argument is that the second clause does not apply to Nemetz and that the two clauses are mutually exclusive. However, plaintiff never raised this argument in the trial court below. It is well settled that issues not raised in the trial court are forfeited and may not be raised on appeal. *Susman v. North Star Trust Co.*, 2015 IL App (1st) 142789, ¶ 41; see *Daniels v. Anderson*, 162 Ill. 2d 47, 58 (1994) (" 'It has frequently been held that *** an issue not presented to or considered by the trial court cannot be raised for the

26

first time on review.' " (quoting *Kravis v. Smith Marine, Inc.*, 60 Ill. 2d 141, 147 (1975))). Before the trial court, plaintiff never claimed that the second prong of the pilot warranty was inapplicable, but argued only the merits of defendant's position concerning that prong. Accordingly, plaintiff has forfeited any argument that that clause does not apply.

¶ 68    Plaintiff also argues that the trial court erred in finding that the second clause was satisfied. This argument requires us to interpret the terms of the policy. "An insurance policy is a contract, and the general rules governing the interpretation of contracts also govern the interpretation of insurance policies." *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 24. "A court's primary objective is to ascertain and give effect to the intention of the parties as expressed in the agreement." *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 416 (2006). "Where the provisions of a policy are clear and unambiguous, they will be applied as written [citation] unless doing so would violate public policy [citation]." *Nicor*, 223 Ill. 2d at 416.

¶ 69    In the case at bar, the parties do not dispute that Nemetz was approved by Chilton, defendant's chief pilot. There is also no dispute that Nemetz did not attend simulator school during the policy period; the record indicates that Nemetz last completed simulator school in May 2010, over two years before the crash. Accordingly, the only question is whether Nemetz satisfied the portion of the policy that required that "all turbine pilots are going to simulator school for the make and model they are operating annually." The trial court found that Nemetz had satisfied this requirement because he had until the end of the policy period to attend simulator school and was not required to have completed school prior to the accident.

¶ 70        While we agree with the trial court that the policy permits a pilot to attend simulator school at any time during the policy period, we cannot agree with its conclusion that this fact means that Nemetz satisfied the policy's requirements. The plain and ordinary meaning of the word "annually" is "once a year; each year." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/annually (last visited June 13, 2019). This implies a recurrent action—something that occurs once a year or each year. This implication is reinforced by the requirement that the pilot be "going to simulator school" annually, indicating an ongoing action. Thus, the relevant inquiry is whether Nemetz was going to simulator school once a year or each year. The record indicates that he was not—the last time he attended simulator school was in 2010. Accordingly, Nemetz was not "going to simulator school *** annually" by any stretch of the imagination. The analysis might be different if the record showed that Nemetz attended simulator school each October, for instance—then, the fact that he had not attended simulator school during the policy period prior to the June accident would not be dispositive because his prior history would have established his pattern of annual attendance. However, the record shows no such thing. Similarly, if this was the first year that such a requirement was imposed, an argument could be made that Nemetz would have attended simulator school later in the year but did not have the opportunity to do so before the claim was denied. Again, however, this is not the case—the record shows that the annual requirement was included in the 2011-2012 policy. While the policy gives a pilot the flexibility to attend simulator school at any time during the policy period, the policy nevertheless requires him to actually do so. Nemetz did not actually do so, either before or after the accident, and had not done so for several years. We cannot find that these actions demonstrate that Nemetz was "going to simulator school *** annually" and, consequently,

cannot agree with the trial court's conclusion that this portion of the pilot warranty was satisfied.

¶ 71    However, this is not the end of our inquiry, because we may affirm on any basis apparent in the record, whether relied on by the trial court or not. *Ray Dancer*, 230 Ill. App. 3d at 50. Accordingly, we may affirm the trial court's grant of summary judgment if we find that Nemetz satisfied the first part of the pilot warranty clause. This part provided coverage for:

> "Robert Policano, Paul Nemetz provided they each have successfully completed company approved ground and flight training for a turbine aircraft within the preceding 12 months of any date he acts as Second in Command."

¶ 72    Before the trial court, defendant argued that "company" was ambiguous, but does not make this argument on appeal. Instead, defendant argues that the clause is illusory and, therefore, unenforceable. An illusory promise is a promise for which performance is optional. *DiCosola v. Ryan*, 2015 IL App (1st) 150007, ¶ 20. "An illusory promise appears to be a promise, but in actuality the promisor has not agreed to do anything." *DiCosola*, 2015 IL App (1st) 150007, ¶ 20. A common type of such promise is where the promisor retains an unlimited right to determine later the nature or extent of his performance. *Dwyer v. Graham*, 99 Ill. 2d 205, 209 (1983). Defendant claims that the requirement of plaintiff's approval of any ground and flight training program "reserves to [plaintiff] the unilateral, unfettered ability to decide at any time what training it would approve for Mr. Nemetz so that he would be covered under this policy. [Plaintiff] could withhold or defer approval to deny a claim no matter the particulars of any training regimen undertaken by Mr. Nemetz or proposed by [defendant]." We do not find this argument persuasive.

¶ 73    The pilot warranty requires Nemetz to have completed company-approved ground and flight training prior to the time he pilots an airplane as second-in-command. Thus, by definition, any approval would have needed to occur prior to the flight—otherwise, defendant would have no way of warranting that Nemetz had "successfully completed company approved ground and flight training" before the flight. Defendant's claims that the clause "effectively gave [plaintiff] the *post-accident* power to decide the terms of the policy so as to deny coverage" (emphasis in original) are therefore inaccurate.

¶ 74    Additionally, the mere fact that the policy gives plaintiff some discretion does not render the clause illusory. Implicit in every contract in this state is a duty of good faith and fair dealing. *Diamond v. United Food & Commercial Workers Union Local 881*, 329 Ill. App. 3d 519, 526 (2002). "Good faith requires the party vested with contractual discretion to exercise it reasonably, and he may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties." *Bank One, Springfield v. Roscetti*, 309 Ill. App. 3d 1048, 1059-60 (1999). Here, plaintiff's approval of any training program would be subject to that same duty of good faith and fair dealing. Accordingly, we cannot find that the clause is illusory and unenforceable.

¶ 75    Since the clause is enforceable, the question, then, is whether Nemetz's training complied with the clause. Defendant does not claim that it ever submitted any proposed training program to plaintiff for approval, and Ackland's affidavit, attached to plaintiff's second motion for summary judgment, avers that plaintiff never received any such request for approval and did not approve any training program. Consequently, there is no way that Nemetz can be said to have satisfied the first part of the pilot warranty. Since Nemetz did not

satisfy either part of the pilot warranty, there was no coverage for the airplane at the time of the crash and the trial court should have entered summary judgment in plaintiff's favor.

¶ 76                                                    CONCLUSION

¶ 77        For the reasons set forth above, defendant failed to comply with the insurance policy's pilot warranty endorsement and the trial court erred in granting summary judgment in defendant's favor. The trial court's judgment is reversed and the cause is remanded to the trial court with instructions to enter summary judgment in plaintiff's favor.

¶ 78        Reversed.